MOTION PICTURE PATENTS CO. v. INDEPENDENT MOVING PICTURES CO. OF AMERICA.

(Circuit Court of Appeals, Second Circuit. August 10, 1912.)

No. 228.

PATENTS (§ 328*)—INFRINGEMENT—PROJECTING KINETOSCOPE.

The Latham patent No. 707,934 for a projecting kinetoscope cannot be construed as to any of its claims as including a camera, but must be limited to a projecting apparatus, especially in view of the proceedings in the Patent Office preceding the introduction of such claims by way of amendment. As so construed, *held* not infringed.

Coxe, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York; Learned Hand, Judge.

Suit in equity by the Motion Picture Patents Company against the Independent Moving Pictures Company of America. Decree for defendant, and complainant appeals. Affirmed.

The patent in question, No. 707,934, was granted to Woodville Latham August 26, 1902, for new and useful improvements in projecting kinetoscopes.

The specification says:

"The present invention has reference to apparatus for projecting successively and at frequent intervals on a screen, or other plane surface, an extended series of photographs of moving objects, whereby the movement of the objects may be accurately exhibited.

"The purpose of the invention is to provide an apparatus capable of continuously projecting or exhibiting upon a suitable surface a great number of pictures taken from moving objects and arranged upon a strip of film of great length, whereby each picture in the strip is brought to rest at the moment of projection, so that there is given to the eye an impression of objects in motion in a manner now well understood.

"In an apparatus organized so that the picture-bearing strip is caused to move continuously and uninterruptedly across the optical axis a light of very high intensity is necessary to give satisfactory results; but a light of such power is not required for satisfactory projection by means of an apparatus embodying the principle of the present invention. The stoppage of each picture during its exposure permits the requisite quantity of light to pass through the condenser, the picture, and the objective to the screen or plane surface upon which the image is projected when the light employed is only of a moderately high power.

"The invention therefore consists in an apparatus for projecting successively a large number of pictures of moving objects, embodying, among other things, means for bringing each picture to rest at the moment of projection, means for reducing the strain the picture-film would otherwise suffer from the rapid interruption and renewal of its movement, and means for maintaining uniformity of movement of the film as it unwinds from the delivering

---

reel, and as it winds upon the receiving reel, all as set forth in the claims at the end of this specification."

The claims involved are the first, third, fifth, and eighth. They relate to the film-feeding mechanism, and are as follows:

"(1) The combination with devices for supporting the bulk of a flexible film before and after exposure, of feeding mechanisms located between the devices for supporting the film and separate and distinct therefrom, one of said feeding mechanisms being constructed to uniformly feed the film and produce a predetermined supply of slack, and the other adapted to intermittently feed the slack across the exposure window."

"(3) The combination with devices which support the bulk of the film and supply it for exposure and receive it after exposure, of positively driven devices separate and distinct from the film-supporting devices, located between them and at opposite sides of the exposure window, and which respectively engage with and accurately and uniformly feed the film, and which respectively produce and take up slack in it, and an intermittently acting device located between said last-named devices which intermittently moves the slackened part of the film across the exposure-window."

"(5) The combination with devices which support the bulk of a flexible film and supply it for exposure and receive it after exposure, of positively driven devices separate and distinct from the film-supporting devices and located between them at opposite sides of the exposure-window, and which engage the film and accurately insure its feeding, which last-named devices respectively produce and take up slack in the film, and an intermittently acting device provided with teeth which engage in holes in the film whereby it feeds the film across the exposure-opening."

"(8) The combination with two reels which support the bulk of a flexible film, one of which supplies it for exposure and the other receives it after exposure, of a positively driven device separate and distinct from the said reels and located between the supply-reel and the exposure-window and which produces a loop of slack film, and an intermittently acting device likewise positively driven which moves the film picture by picture into the optical axis at the exposure-window and causes each picture to remain momentarily at rest in the optical axis."

The District Court was of the opinion that the claims were limited to the use of the apparatus in projecting machines; and, as the defendant uses its machine as a camera for taking pictures, and not for projecting them on a screen, it does not infringe.

The following is the opinion of the District Court, by Hand, District Judge:

"In spite of the many questions which this case raises, there is only one that I shall consider, because it seems to me quite fatal to this suit, although it does not, directly at any rate, affect the validity of the patent itself. I mean the point that the patent does not cover a camera, which is the only infringing device in evidence. I confess that when this point was raised upon the hearing I was at first blush strongly disposed against it, because it seemed then to be an effort to take advantage of what was at best a doubtful vagueness in the claims, coupled with the mere title of the invention, which, perhaps, had been thrust upon the patentee by the classification of the Patent Office. However, even with this predisposition against the defense, a more thorough examination of the way the patent came to be granted has satisfied me that to construe it as covering cameras will be to make successful, or at any rate to take one step towards making successful, the evasion of the whole effect of the long and carefully considered litigation in the Patent Office. It is quite true that the point turns only upon the fact that at the outset the patentee claimed one invention only, when he might, perhaps, have claimed two, and there is a color of injustice in holding him only to what he claimed; but that injustice is certainly answered by

the fact that in the bargain between himself and the sovereign he dedicates to the latter all that he does not claim: and it is a hardship to those who may have acted upon the strength of his disclaimer to lose in turn the fruits of their own industry and invention, because he, who thought it first without value, now finds that he was mistaken. This case presents an especially clear instance of this very thing. However, it is of no consequence what the reasons may be, or, indeed, whether they are in the least reasonable; the courts have always forbidden such a fundamental change in the claims as amounts to a new invention.

"Coming from these general considerations down to the especial facts of this case, I shall consider the application and claims as originally filed by the patentee on June 1, 1896, more than a year after he or Lauste had concededly perfected a camera, but (except for the experiments prior to May, 1895, which were held insufficient in the Patent Office) less than five months before he had perfected his projector.

"The petition is for 'improvements in apparatus for projecting on a screen pictures of moving objects.' The specification recites the same phrase, and in the preamble states: 'The present invention has reference to apparatus projecting continuously on a screen, or other plane surface, many thousands of photographs of moving objects, whereby the movement of objects is accurately exhibited.' The patentee then proceeds to state that the purpose of the invention was to avoid the necessity of the light of the highest intensity on account of the stoppage of each picture during its exposure. This being the purpose of the invention, the inventor speaks as follows of the invention itself: 'My present invention accordingly consists of an apparatus for projecting continuously a great number of pictures of moving objects, embodying means for bringing each picture to rest at the moment of projection, means for reducing the strain the picture-film would otherwise suffer from the rapid interruption of its movement, and means for maintaining the uniformity of tension of the film as it unwinds from the delivery wheel, and as it winds upon the receiving wheel, all set forth in the claims.' Then follows a description of the figures and mode of operation, which throughout show in many instances that the invention is a projector only. Throughout the strip is spoken of as a 'picture-film' or 'picture-bearing strip.' It will serve no useful purpose to select all the instances of the use of these terms; for I do not understand that the complainant contends that the disclosure was not strictly limited to a projecting machine; his position being, correctly enough, that, whatever the disclosure, the patentee is entitled to its uses.

"Coming then to the claims as originally filed, one finds that claims 1, 2, 3, and 4 are limited to an 'apparatus for projecting on a screen, or other plane surface, pictures of moving objects.' So far the inventor was strictly consistent with the description of what his invention consisted of. Claims 5, 6, and 8 begin as follows: 'Combination with a perforated picture-bearing strip and feeding appliances therefor,' which likewise clearly limits the claim to the definition in the specification: that is, to a 'machine for projecting pictures.' There remain 7, 9, and 10. Claim 10 likewise gives as a part of the combination a 'picture-bearing strip.' Claim 7 in general terms describes the mechanism by which one shaft shall transmit a continuous movement to two drums and an intermittent movement to a third. Claim 9 describes on a diagram the details of the mechanism by which the intermittent motion is acquired. Claims 7 and 9 are equally applicable to a camera as to a projecting machine.

"Nothing further was done of any consequence in the office until, on January 23, 1897, an interference was declared upon a common claim for a projecting machine. While it is true that this interference concerned chiefly the relation between the period of illumination to that of motion, it is to be noted that the issue as framed included not only that, but also 'the mechanism for feeding the film so as to provide slack therein between the same and said tension device whereby the film may be intermittently moved with great rapidity without unnecessary strain and wear on film.' Nothing was done for more than three years, during which the interference was pending.

The dates of the decisions are. however. quite significant. The examiner for the interference filed his decision on June 14, 1899, which granted priority to Latham. That decision was based upon the theory that Latham's experiments in the spring of 1895, whether with or without the shutter, constituted an adequate reduction to operation of the machine as a projector. The examiners in chief reversed this decision on November 16, 1899, proceeding specifically upon the theory that the invention of the camera was not an invention of a projecting machine; that a projecting machine was not a use for a camera; that therefore there must be some proof that Latham had used with substantial success his machine as a projector prior to November, 1895, the date of Armat's invention; and that there was no such proof in the case. The second appeal, which was to the Commissioner, was decided by him on February 5, 1900, and proceeded upon substantially the same grounds as the decision of the examiner in chief. The final appeal was taken to the Court of Appeals of the District of Columbia, which filed its decision on January 8, 1901, affirming the decisions below, upon the especial ground that Latham had not perfected his machine as a projecting machine in the spring of 1895. After that decision it was therefore conclusively settled that Latham could never get a patent for a projecting machine, which covered the substance of the issue which had been framed. While it was open to him, therefore, upon his prior application to get a patent for anything not covered by the interference, nothing else was open to him. On March 23, 1901, he filed 7 new claims, which, so far as the matter in question is concerned, are essentially the same as those eventually allowed. Each one of those claims reads quite as well upon the camera as upon the projector, except claim 12. Thus of the 14 claims then present before the Patent Office the first 11, when read alone, had become ambiguous.

"Two questions arise: First. As a mere matter of interpretation, should the claims be held to include a camera? Second. If that be a fair interpretation, has the patentee, by amendment, put in a 'new invention'? Railway Co. v. Sayles, 97 U. S. 554, 24 L. Ed. 1053; Hobbs v. Beach, 180 U. S. 397. 21 Sup. Ct. 409, 45 L. Ed. 586; Gilmer v. Geisel (C. C.) 187 Fed. 606; Id., 187 Fed. 941, 109 C. C. A. 620; Hestonville, etc., Ry. Co. v. McDuffee, 185 Fed. 798, 109 C. C. A. 606. This is certainly not permissible where, as here, the amendments which create the 'new invention' have never been sworn to by the inventor. Eagleton Mfg. Co. v. West Mfg. Co., 111 U. S. 490, 4 Sup. Ct. 593, 28 L. Ed. 493; American Lava Co. v. Steward, 155 Fed. 731, 84 C. C. A. 157.

"First as to the question of interpretation. In principle certainly there can be no doubt that the so-called doctrine of 'equivalents' has no application, when the claims are not ambiguous. The words in the claims must, of course, be read intelligently, and without illiterate literalism. Where there is any ground for ambiguity, the usual canons of interpretation fit a patent as well as any other document. The doctrine of equivalent is especially applicable in answer to the argument that the claim reads only on the disclosures. Indeed, a leading case, Winans v. Denmead, 15 How. 330, 14 L. Ed. 717, arose. when the claim did read on the disclosure literally. It was quite clear there that the inventor did not mean by his claim only the exact disclosure, even if he used words which literally meant so. But when, as is now so universal, the elements of the claims are described in terms of general applicability, while the inventor should be allowed whatever latitude arises from the use of words, at best but ambiguous instruments, still if it be clear that whatever latitude be given, the words he has chosen do not cover the infringement without an obvious abuse of them, then he must fail. I am aware that there have been decisions (e. g., McSherry Mfg. Co. v. Dowagiac Mfg. Co., 101 Fed. 716, 41 C. C. A. 627; Kings County Raisin & Fruit Co. v. U. S. Consolidated Raisin Co., 182 Fed. 59, 104 C. C. A. 499), which proceed upon the theory that it may be apparent that the invention does not reside in the claim, and that there may be infringement, where concededly one element of the claim is lacking. With the greatest deference, since these decisions are not authoritative upon me, I must regard them as not in accord with the very great weight of authority, which finds the invention in

the claim alone. If this be true, I must confess that, as a mere matter dialectic, I cannot understand how the court may substitute a new element in the claim for one chosen by the inventor, even where the former operates in the same way to effect the same result. Hard cases should not make bad law; and a patentee who has had the whole field to choose from cannot justly complain if he be held to his choice. Out of all of the discussion which this subject has called forth, I can see nothing that finally remains, except that a court should, on the one hand, try sympathetically and intelligently to understand what the inventor meant by the words he used, and, on the other, should hold him to that meaning, or candidly avow that his patent is not the measure of his rights.

"Now when the patentee says that his invention consists of an apparatus for projecting pictures, he is speaking not of a single disclosure, used for purposes of illustration, but of what the 'invention' is, and the 'invention' is to be found in his claims. It is precisely equivalent to saying, 'What is to be found in my claims is an apparatus,' etc. Any ordinarily intelligent man reading that preamble and then reading the claims would surely think that the claims were only for a projector. This is especially evident when one looks at Latham's patent for a camera and a projector, filed six months later, which shows that he distinguished between projector and camera, and that when he thought a machine capable of both he said so clearly. In view of this application filed after the application for the patent in suit, but before these amendments were made, and with it, as it were, staring the patentee in the face, can there really be any ground for insisting that the patent should now be allowed to cover cameras? Consider, further, that in the amendments on January 17, 1902, after all the litigation, and while he had all the facts before him, Latham's attorney repeats the substance of the old specifications, so that they took the eventual form of the preamble and appear as on page 1, lines 8 to 51. It was then by a deliberate reaffirmation of the invention as consisting of a projector that the claims were inserted. It must be apparent that if the intention had been really to include cameras the applicant would not have left in the application those original statements which directly contradicted what he is supposed to have intended by the change. Why did he do this? Obviously either because he meant nothing of the sort, or because he was afraid to avow his intention and to take his chance of passing it upon the examiner. Either admission is fatal to his now contending that his language effected the change he now claims.

"Again, the whole theory of the changes also precludes the view that it meant to extend the claims to cameras. Latham had been beaten in the interference proceedings because he failed to antedate his feature of 'pause and illumination'; pause being the kernel of his invention up to that time. His first amended claims really repeated the substance of the old ones; for they all had as a feature that the period of rest should exceed that of motion. His attorney, in his argument, said quite frankly that the whole interference issue had been a mistake, and that in any case the decision depended strictly upon the distinction between 'illumination' and 'rest.' He neglected to say that the original claims made no such distinction, but contented themselves with speaking of the momentary 'rest' of the film. The first amendments did not succeed; but the attorney tried again, and submitted, on January 17, 1902, substantially the claims which were eventually allowed. Now it is true that some of these claims (i. e., 1, 3, 7, 11, and 12) do not refer to the period of rest; but the last two are limited claims, and the other three were put in out of abundant caution. My point is that the chief theory of the patent still remained the securing of the period of rest, as it always had been; and this was the important thing for a projector and the reason why Latham had originally limited it to a projector, thinking for other purposes the positive feed devices inferior to his friction feed, which he did apply to cameras as well.

"Therefore I insist that the whole proceedings show from the outset a continual purpose to cover only projectors, starting expressly with that purpose, and changing only with another purpose in mind, at least avowedly. It is not, therefore, a narrow or technical construction of the patent. It is

a construction which tries to understand the proceedings as a whole, and really to interpret them. It is rather the complainant which, seizing upon words of general applicability and neglecting to read them in their history, is really twisting them beyond their proper scope through the invocation of liberal canons which have here no application.

"But even if all this be not so; and if I were obliged to hold, as matter of fair interpretation, that the claims cover a camera, so to interpret them would allow the introduction of a 'new invention,' within the rule I have mentioned above, because, whatever may be the fair meaning of the claims as allowed, no one can for a moment doubt that, as first presented, they were by their terms confined to projectors, with the exception of claims 7 and 9. This is so clear that I shall not elaborate it. Of the two other claims, one was for a detail of the mechanism disclosed, and the other reads upon the figures, and cannot be the basis of expanding the patent.

"What, then, is meant by a 'new invention'? I do not think that it means that the change between the original specifications and the amendments must be itself patentable. Certainly that has not been the test suggested in the cases. Rather it means that there need only be a new element added to the claim, or one taken away, or one substituted for another, without any original suggestion of it in the patent. The rule is the same in this respect as to amendments that obtains as to reissues (Railway Co. v. Sayles, supra), and the distinction is shown in Morse Chain Co. v. Link Belt Co. (C. C.) 182 Fed. 825, and 189 Fed. 584, 110 C. C. A. 564. Now, in the case at bar, there was, as I have said, absolutely no indication anywhere that the invention included cameras. The patented combination in the first six claims contained as one of its elements a projector. What the amendment did was to substitute for that element another, making the element read as it was, 'in a projector or camera.' That certainly created another invention, regardless of whether it was a patentable advance to put the disclosure into a camera, the negative of which I may assume for argument. To say that this is only to put the invention to a new use is to fail to recognize that the projector was an element in the original claim itself. To disclose a combination as fitted for one use, no element of which is included within the elements which the applicant selects to put into his claim, does not limit the invention by the use disclosed. One may put the same 'invention' to a different use, because it will still have the same constituent parts; but if, as here, the 'use' includes certain of the elements which go into the claim, you cannot change the 'use' without changing the substance of the 'invention.' That is this case, at least except as to claims 7 and 9, which, as I have said, referred to the precise disclosure, and cannot be the basis of expanding the patent.

"So much for the argument drawn from the formal change in the claims; but the vice goes to the essence. In his second patent, which, as I have said, he made expressly applicable to cameras and projectors, which operated by friction devices only, and the claims of which do not mention the pause feature, Latham had spoken of that device as 'the only one of which I have any knowledge that is capable of giving anything like accurate results' 'for scientific purposes.' That means that the 'positive feed' of the patent in suit gave nothing like accurate results, as well as being apt to tear the films. Page 1, lines 19 to 22. Turning next to the patent in suit, we see the 'invention,' as defined in the specifications, originally consisted, and still consists, of the positive feed only as a means to the full rest for purposes of illumination. The purpose of his invention was 'the stoppage of each picture during its exposure [to] permit the requisite quantity of light to pass through the condenser,' etc. It consists of three elements—means of bringing the film to rest, means of reducing the strain on the film arising from the rapid interruption and renewal, which the period of rest requires, and means for uniform winding and unwinding. Here is no suggestion that the accuracy of measurement is a factor, or that the positive feed is important, except as the pause requires rapid interruption and renewal. It is perfectly consistent with the second application, which was for accuracy of registration. Coming next to the original claims, the consistency continues. The first four are clearly directed at securing the necessary pause. Claims 6 and

7 are of the same character and refer to the same period of rest. Claim 5 does not mention the period of rest, but refers to the mechanism by which the intermittent rotation of the drum is secured. It is somewhat ambiguous as to the pause feature, if taken alone, but not when taken in connection with the accepted construction of claim 10; for it contains the pause feature as much as the latter. Claims 8 and 9 are for mere details of the mechanism. Claim 10 was that upon which the interference issue was raised, and includes the pause; at least, the applicant could hardly dispute it, after going through all the courts and accepting the issue as a true statement of that claim. The claims after January 17, 1902, do contain the 'positive feed,' some of them alone, and some still as a means of securing the required rest: and it was then the change first occurred.

"Now all this shows that at first Latham conceived his 'invention,' considering that term colloquially, to reside not at all in the positive feed (which he repudiated altogether when used in a camera), except as a means to secure the rest. That was essential in a projector, indifferent in a camera, and he left it out, because he then thought it worthless for any camera use.

"I am now assuming, for argument, that the changed claims now cover cameras, which before they did not. If so, then the complainant's dilemma is this: In so far as the 'invention' resides now in the 'positive feed' feature, it is a complete abandonment of his position for nearly six years after the application was filed. In so far as it resides in the 'rest' feature, it completely ignores the interference litigation as though it had never occurred. As to the former, I think I have already shown it in enough detail. There was no suggestion anywhere of it till the date I mention. There was repudiation of its accuracy in the second patent. The means to secure the rest were of consequence only in so far as they actually did assure the period of rest. If the patent abandons that and substitutes the 'positive feed' as the patent, it has become a 'new invention' in every sense.

"Moreover, there are more important considerations than the mere lapse of time. Armat and Casler had machines which, in respect of 'positive feed' as the complainant now understands it, infringe his present claims. Furthermore, in respect of that feature, probably his camera use is sufficient to antedate them. By his change of front he has included those whom before he did not, except by the original feature of his claims, upon which he was beaten, and this by the selection of a feature he had originally abandoned. Now, the policy of the statute was to prevent that very thing. It was to prevent a man's gambling upon his ingenuity, avoiding the expense of a patent till his invention proved successful, and, then after others had acted upon his inaction, getting a monopoly for the full period of 17 years. If Latham had waited so long without filing any application, he could not have succeeded; and the rule against allowing him to amend is designed to prevent his doing by indirection what he could not do directly.

"Coming now to the 'rest' feature, the complainant's case is even worse; for his attorney quite naively got those claims upon the theory that the interference issue was a mere nullity and effected nothing. Now, it is not necessary to determine how far the issue was correct, and how far 'pause and illumination' have anything to do with 'rest.' It may be that Latham suffered by the reduction of his claims, though I think it quite clear that he did not, but he fought it out upon that issue for nearly five years; and it is really rather too hard a position to take in a court, however it may be before an examiner, that such an assent does not estop him. While Latham's attorney conceded that Armat got the benefit of the interference, yet, since he denied that Latham's claims were embodied at all in the issue, it is hard to see what Armat did get. The matter is, indeed, quite confused; for the only relevant claim Latham then had was original claim 10, and that was a very special one. However, it said nothing of 'illumination' as distinct from 'rest'; and the patent was throughout based on the supposition that the 'illumination' and the 'rest' occupied the same period. The court did not deny that the patent so intended; but they did deny that the use in the spring of 1895 reduced that feature to practice, though Latham's at-

torney seems to have supposed that the courts had confused the two. To re-instate the 'rest' claims, of which claim 8 in suit is one, was really a most extraordinary vagary of the lay mind, as it seems to me, and deprived Armat of not only the substance of his success, as did the substitution of the 'positive feed' claims, but of even of the semblance of any fruits of victory whatever. It cannot be necessary to show that the Patent Office is not the place in which to play fast and loose like that.

"Much of the last argument goes beyond the question of whether the claims cover a camera; but I mean to decide nothing else. My point is that if they do include a camera they were brought in by an amendment, which was in part a radical departure from the invention, after six years, and when others had secured rights, with much expense, upon the faith of the application as it was—in remainder, a mere disregard of all the proceedings theretofore had in the Patent Office. What the effect of this may be upon the claims for any other purpose, I leave to be decided when it may arise.

"The bill will be dismissed for noninfringement, with costs."

Kerr, Page, Cooper & Hayward, of New York City (Thomas B. Kerr and Parker W. Page, both of New York City, of counsel), for appellant.

Kenyon & Kenyon, of New York City (William Houston Kenyon and Richard Eyre, both of New York City, of counsel), for appellee.

Before COXE, WARD, and NOYES, Circuit Judges.

PER CURIAM. The majority of the court are of the opinion that the decree appealed from should be affirmed, with costs, upon the opinion of Judge Hand; and it is so ordered.

COXE, Circuit Judge (dissenting). The dismissal of the bill by the District Court upon the sole ground of non-infringement, for the reason that the claims in question relate to a projector, whereas defendant uses a camera, presents a question which may be broadly stated as follows: Should these claims, the language of which covers a feeding mechanism which is capable of being used in the defendant's camera, as well as in the projector described in the patent, be so limited that they cover the use of the feeding mechanism in the projecting apparatus only?

In approaching the consideration of this question it must be remembered that the claims in controversy are not, so far as their language is concerned, limited to any particular machine and that the combinations described are as capable of use in a camera as in a projector. So far as the combinations which we are now considering are concerned, they might as well have been illustrated in a camera as in a projector and the description and drawings might as well have been confined to a camera as to a projector. The machine can be used as well to take pictures as to project them upon a screen. I do not understand that this proposition is seriously disputed. The camera and the projector belong to analogous arts and can be used interchangeably in each. Take from the projector the well-known parts, the objective, the condenser and the light, which are intended to throw the pictures in rapid succession upon the screen, and a successfully operating camera remains. Add these parts to the camera and the result is a machine capable of exposing the pictures to an audience.

The combination for a projector requires more elements than for a camera, but if the camera be new and useful, there is no reason why the inventor may not cover by his claims the combination which comprises the camera. Of course, in considering the single defense of non-infringement, novelty and invention must be conceded.

The defense here, as I understand it, is predicated of the proposition that Latham's achievement must be rigidly limited to a projecting device and though he may have made a meritorious invention of a camera, he is nevertheless limited to his title of "Projecting-Kinetoscope." If this contention be sustained, any one can use the exact structure shown, provided he does not use it in a projecting machine. I am unable to assent to this proposition. It is a fundamental canon of construction of patent law that where the court is convinced that the patentee has made a valuable invention, the patent shall be interpreted, if possible, to give him the full results of his labors. He may have so entangled himself in a maze of contradictory verbiage that it is impossible to do this, but if two constructions can be given his claims, it is the duty of the court to adopt the one which vitalizes rather than the one which destroys them.

The inventor is entitled to all the uses to which his invention may be put and the court should, if possible, see that he secures its full benefits. He should not be impaled on the point of a too literal construction. In the present instance I see no reason why Latham, if it be shown that he was the first to invent the improved camera, should not reap the rewards of this division of his invention. His claims cover it and there is nothing in the description which definitely limits its use to the exposing rather than the taking of pictures. If these claims do not cover a camera what do they cover?

Take the first claim, for instance. Construct a machine in exact accordance with the directions of the specification and having all the elements of the claim, what will be the result?

Such a machine will contain: 1. Devices for supporting the bulk of a flexible film before and after exposure. 2. Feeding mechanism located between the devices for supporting the film and separate and distinct therefrom. 3. One of said feeding mechanisms being constructed to feed the film uniformly and produce a predetermined supply of slack. 4. The other adapted to feed the slack intermittently across the exposure-window. Would such a machine project pictures upon a screen? None of the necessary accessories of such a machine is included in the combination. The condenser, the objective and the light are not elements and the use of the combination as a projector is not mentioned. What is to be done with such a machine? It cannot be used as a projector, for it has not the necessary parts, and, if the defendant be correct, it cannot be used as a camera because the patent must be limited to a projector. I cannot think that the patentee should be left in this dilemma with a claim practically valueless—a derelict of the patent law. On the contrary, I think that Latham invented a machine capable of use as a camera, that he has described this machine in his specification, illustrated it by his drawings and covered it by his claims.

The construction of the machine and the uses of which it is capable are manifest, and, this being so, the patentee should not be deprived of the fruits of his invention, even assuming that he has given it a wrong name. Nomenclature must yield to facts.

In short, my conclusion, upon this branch of the case, is that if Latham has invented a new and useful camera, he cannot be defeated upon the theory of non-infringement because he described and illustrated his invention in a projector.

The patent should be construed with reference to what the description shows and the claims cover and not according to the title forced upon the applicant by the examiner.

As was said by the court in Bell v. Daniels, 1 Fish Pat. Cas. 372, Fed. Cas. No. 1,247:

"The plaintiff is not controlled by his title, but the patent, specification and drawings are all to be examined, and are all to have a fair and liberal construction in determining the nature and extent of the invention."

See, also, Inman v. Beach, 71 Fed. 420, 18 C. C. A. 165; Hobbs v. Beach, 180 U. S. 385, 21 Sup. Ct. 409, 45 L. Ed. 586; Cleveland Foundry Co. v. Detroit Co., 131 Fed. 853, 68 C. C. A. 283.

The contention that the words, "In a projecting-kinetoscope" should be read into claims which do not contain them is wholly untenable both as an original proposition and also because the courts have repeatedly held that such limitations of the claims are unwarranted. An inventor cannot anticipate every use to which his invention may be put and is not called upon in limine to deprive himself of such uses by putting his invention in a strait-jacket.

The employment of Latham's combination as a camera did not require invention; any mechanic skilled in the art would know enough to do this. It was simply applying it to a different, though analogous, use.

It has been assumed through all stages of this litigation that a camera could be used as a projector and vice versa. Thus the Court of Appeals of the District of Columbia says:

"A picture-taking camera, like many of those heretofore referred to as patented, could undoubtedly be utilized as an apparatus for exhibiting pictures also, by substituting a picture film in the carrying device and then applying the apparatus of the magic lantern."

The District Judge also says that claims 7 and 9, as originally filed, "are equally applicable to a camera as to a projecting machine."

I have thus far proceeded upon the hypothesis that Latham was the first to make the invention which is the subject of the claims in controversy.

The invention consists of a film-feeding mechanism operated by continuously rotating sprockets, a loop being produced and maintained in the slack film. Also a sprocket, rotating intermittently, which feeds the slack loop across the optical axis section by section. It is described in the specification as consisting in employing "means for bringing each picture to rest at the moment of projection, means for reducing the strain the picture-film would. otherwise suffer from the

rapid interruption and renewal of its movement, and means for maintaining uniformity of movement of the film as it unwinds from the delivering reel, and as it winds upon the receiving reel."

The invention introduced a decided improvement to the art and one which can be used with equal advantage in a projector and a camera. If it were a new and useful improvement as to one, it was equally so as to the other.

Bearing in mind that the invention with which we are concerned consists of the apparatus which produces this intermittent movement of the film across the exposure opening, I am unable to find any proof in the record which anticipates.

Latham's application was filed June 1, 1896. His invention was made on or prior to February 26, 1895, and was put into practical operation on that date, as a camera, its use as a projector having been also demonstrated.

The complaint admits that the invention of Latham was shortly after February 26, 1895,

"invented independently in France by M. J. H. Joly, who used it both in cameras and projectors, and still later in the year 1895, in this country, by Thomas Armat, who used it exclusively in projecting machines."

This admission undoubtedly anticipates the filing date of June 1, 1896, and throws upon the complainant the burden of establishing the date of the invention at a period anterior to the dates of the Joly and Armat structures. This has been done. I do not deem it necessary to discuss the testimony in detail because it fully establishes the fact of the completion and reduction to practice by Latham, on the evening of February 26 or the morning of February 27, 1895.

The defendant took no evidence on this issue. It is asserted that the evidence is insufficient because the device relied on was not a projector, but a camera. I have already shown that the two devices were used interchangeably and, where it appears that the inventor was the first to make the precise structure which he now claims, it is not material what he called it or how he first used it in the moving picture art. He was entitled to any use to which it might be legitimately put in that art.

The testimony does not bear out the defendant's other contentions that the adaptation and use of the device as a projector is not satisfactorily established, that it was an abandoned experiment and was not the work of Latham, but of his mechanic, Eugene Lauste.

The conception was Latham's, worked out and made operative by skilled mechanics employed by him.

Latham says:

"When the idea came into my head * * * it was necessary for me to get the help of skilled mechanics."

It would be necessary to ignore arbitrarily the testimony in order to reach a conclusion that some one other than Latham conceived the invention. If Latham conceived it, the fact that he employed others to embody his idea in a working machine does not deprive him, and his assigns, of the fruits of the invention.

Of course the process of taking and projecting pictures varies in several details, many of which are pointed out in the defendant's brief, but I do not deem it necessary to consider them at length, in view of the controlling circumstance that the machine, the physical thing, is capable of taking and projecting pictures. The picture-bearing strip might as well have been described as "a strip designed for bearing pictures"; it is the same strip in either case. When used as a camera the pictures are impressed upon the strip during the passage through, when used as a projector the same pictures, on the same strip, are passed through in the same manner.

It would seem to be an exceedingly harsh doctrine to hold that when one has invented a complicated and delicately organized machine, consisting of a combination of reels, drums, pulleys and sprockets, designed to manipulate the film; invention and infringement must depend upon the color or length of the film. The combination is the same whether the film is impressed with the pictures while passing through, or whether the same film with the pictures completed is passed through.

If the camera of February 26th did not embody the invention in issue, nothing could do so, it *was* the invention in issue.

The Edison patent No. 493,426 shows a continuously moving film with no intermittent motion. The Edison patent No. 589,168 is for a "Kinetographic Camera." He says:·

"The purpose I have in view is to produce pictures representing objects in motion throughout an extended period of time which may be utilized to exhibit the scene including such moving objects in a perfect and natural manner by means of a suitable exhibiting apparatus, such as that described in an application filed simultaneously herewith (patent No. 493,426, dated March 14, 1893). I have found that it is possible to accomplish this end by means of photography."

The complainant's expert, Mr. Waterman, asserts, and I see no reason to differ from him, that the apparatus here described can be used equally well for taking pictures and projecting them. It comprises a supply and a take-up reel with an escapement between them having a sprocket wheel engaging the holes perforated at regular intervals on the two edges of the firm to feed it along intermittently across an exposure opening.

There is not, however, the distinguishing characteristic of the Latham patent, the second feeding mechanism which continuously maintains a loop and relieves the pressure on the intermittently feeding sprocket.

Thomas Armat testifies that the Edison Company began to put out projecting machines in the fall of 1896 or the spring of 1897. He says:

"These last mentioned machines, however, at this date did not at first embody the feature of providing slack between the supporting reel and the intermittently moving device, and they had a very short life as thus put on the market."

The problem I am now considering was solved, not by Edison, but by Latham.

The patents to Marcy, though prior in time, do not disclose the Latham invention. The film is pinched between two rollers and is advanced by the revolving of the larger roller, at a uniform rate. There are no sprocket wheels and no holes in the edges of the film to engage such sprockets, the film is moved by friction and therefore lacks the uniform and definite action of the Latham device.

The Chinnock camera, assuming it to have been completed and operative prior to the Latham invention, which proposition is disputed and in doubt, does not anticipate for reasons similar to those just above stated regarding the Marcy camera. The film is advanced by continuously driven friction rolls, and is arrested and released by a clamp intermittently operated. There is also a pair of friction rolls below the exposure opening; they are of a greater diameter than the upper rolls and revolve at a higher speed but are arranged to slip over the film when it is clamped. The function of these rollers is to pull down a certain amount of film and they are, therefore, made larger in diameter and are driven at a higher speed. With the addition of these rolls, the Chinnock device is substantially similar to the Marcy device. It does not have the essential features of the Latham invention, as before pointed out, viz., the loop of slack film produced by the film-feeding mechanism operated by continuously rotating sprockets together with an intermittently operating sprocket which feeds the slack across the exposure window.

I do not deem it necessary to refer to the friction roll printing press patents further than to say that I consider them as belonging to a different art and much more remote than the patents already considered.

The complainant is criticised for "reading into the claims" the sprocket type of feed but as the claims must be construed in the light of the specification and as the description describes the sprocketed feed drums, the teeth of which engage the holes in the films, and as the drawings clearly show these features, I see no just basis for the criticism.

It is also charged that the complainant has been guilty of laches in permitting infringements to proceed during five and a half years which elapsed after the patent was issued. Undoubtedly there was this delay, but in view of the protracted litigation which had impoverished the then owners of the patent, I cannot find that this delay amounted to laches. Under its present owners infringers have been vigorously prosecuted and it is alleged that all of the infringers have taken out licenses under the patent.

The patent encountered unusual vicissitudes from the moment the application was filed and its progress through the Patent Office met with opposition and discouragement at almost every stage. I cannot find, however, that anything occurred there to deprive Latham of his invention. The issue in the interference between him and Armat was a narrow one, and though it was decided in favor of Armat, it is plain that this occurred because of the restricted scope of the issue between them. No one can read the decision of the Court of Appeals without

being convinced that it was reached because of the narrow issue presented in the interference. For instance, the court says:

"We are free to confess in this case, that, the inspection of the original machine, and the proof of its efficient performance in intermittently moving the film for the taking of pictures, in connection with the evidence of the first private trials in exhibiting pictures, has strongly inclined us to decide in favor of its reduction to practice."

But they were unable to do this because of "all of the limitations and requirements of the issue." If the questions had been those with which we are now concerned, I am persuaded that the court would have reached a different conclusion. I am not convinced that Latham's conduct in the Patent Office was unfair or disingenuous, unless persistent and untiring effort to secure what he believed to be his rights can be so characterized. He fought on until he secured claims which covered not a different invention, but the invention which he had reduced to practice in February, 1895. I am convinced that Latham made a valuable invention, not an epoch-making invention, it is true, but one which introduced a much needed improvement into the motion picture art. It remedied the difficulties which had baffled inventors of unquestioned genius and placed the art upon a successful commercial basis. In such circumstances, it is, in my opinion, the duty of the court to save rather than to destroy the patent.

For these reasons I am unable to concur in the disposition of this appeal by the majority of the court. I think that the decree should be reversed and the cause remanded to the District Court with instructions to enter a decree in favor of the complainant with costs.